1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19

MONICA SMITH and ERIKA SIERRA, individually and on behalf of all other similarly situated individuals,

Plaintiffs,

v.

KAISER FOUNDATION HOSPITALS, a California corporation,

Defendant.

Case No.:  18cv780-KSC

**ORDER RE RENEWED MOTION FOR PRELIMINARY APPROVAL OF CLASS/COLLECTIVE ACTION SETTLEMENT, APPROVAL OF CLASS NOTICE, AND SETTING FINAL APPROVAL HEARING [DOC. NO. 78.]**

20
21
22
23
24
25
26
27
28

Before the Court is plaintiffs' Renewed Motion for Preliminary Approval of Class/Collective Action Settlement and Class Notice.  [Doc. No. 78.]  Plaintiffs' Renewed Motion requests that the Court enter an order (1) preliminarily certifying the proposed Settlement Class under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and as an FLSA Collective under United States Code, Section 216(b); (2) preliminarily approving the parties' Amended Settlement Agreement (the "Amended Agreement"); (3) preliminarily appointing plaintiffs Smith and Sierra as representative Class Members and Class Counsel as counsel for the Class Members; (4) approving the parties' proposed Notice; and (5) scheduling a hearing on the final approval of the Amended Settlement

1

1   Agreement and approval of the application of Class Counsel and plaintiffs for their
2   requested attorneys' fees, costs, and service awards. [Doc. No. 78-1, p. 10.]

3   　　　　For the reasons outlined below, the Court finds that plaintiffs' Renewed Motion for
4   Preliminary Approval must be GRANTED in part and DENIED in part without prejudice.
5   In this regard, the Court finds that plaintiffs' Renewed Motion must be GRANTED to the
6   it seeks preliminary approval of a class under Rule 23 and preliminary or conditional
7   certification of an FLSA collective.   However, the Court finds that plaintiffs' Renewed
8   Motion for Preliminary Approval must be DENIED without prejudice as certain matters
9   discussed herein must be addressed prior to preliminary approval of the proposed
10  settlement.

11  *I.*    ***Background.***

12  　　　　This class and collective action involve an alleged failure by defendant Kaiser
13  Foundation Hospitals ("Kaiser") to properly compensate certain call center employees.
14  Kaiser offers call center services to patients and insured members located in California,
15  Georgia, and Hawaii. [Doc. No. 70, First Amended Complaint ("FAC"), ¶¶ 1-2.]
16  Defendant Kaiser employs "Telemedicine Specialists," "Customer Support Specialists,"
17  and "Wellness Specialists" to receive and respond to call center calls, among other duties.
18  [*Id.*] Some of the Telemedicine Specialists, Customer Support Specialists, and Wellness
19  Specialists are employed at a brick-and-mortar facility in San Diego, California. Kaiser
20  also employs "Remote" Telemedicine Specialists, Customer Support Specialists and
21  Wellness Specialists, who work most or all their hours from their residences in California.
22  [*Id.* at ¶ 6.]

23  　　　　Plaintiffs allege that Kaiser does not compensate its Telemedicine Specialists,
24  Customer Support Specialists, and Wellness Specialists for certain activities required of
25  their employment, including primarily: (1) starting-up and logging-into computers,
26  programs, and applications before each shift and prior to clocking into Kaiser's
27  timekeeping system; (2) performing computer, program and application shutdown and log-
28  in tasks off-the-clock during their uncompensated meal periods; and (3) shutting-down and

logging-out of computers, programs, and applications, subsequent to each shift and after clocking out of Kaiser's timekeeping system. [*Id*. at ¶10.] Additionally, they contend Kaiser fails to pay Telemedicine Specialists, Customer Support Specialists, and Wellness Specialists for time spent: prior to each shift locating equipment; subsequent to each shift shredding and disposing of patient notes; driving to Kaiser's brick-and-mortar locations on days they experience technical or connectivity issues with computers, programs and applications; reviewing their hours and punches on Kaiser's timekeeping system; and traveling to mandatory training and staff meetings or to pick up necessary equipment. [*Id*. at ¶¶ 10-11.] They also claim Kaiser fails to reimburse Telemedicine Specialists, Customer Support Specialists, and Wellness Specialists for necessary business expenditures incurred in the execution of their job duties. [*Id*. at ¶11.]

Plaintiff Monica Smith was initially employed by Kaiser as a Telemedicine Specialist at its brick-and-mortar call center but has worked as a Remote Telemedicine Specialist since May 2012. [*Id*. at ¶¶ 31–33.] She is compensated at a base rate of $59.42 per hour with a shift differential and typically works approximately 40 or more hours per week (and more than 8 hours per day). [*Id*. at ¶ 31.]  Her typical shift runs from 6:45 a.m. to 3:15 p.m. [*Id*.] From October 2012 through August 1, 2015, as part of her duties as a Remote Telemedicine Specialist, Kaiser required Smith to work one shift per month at its San Diego brick-and-mortar call center location. [*Id*. at ¶ 34.] Since August 1, 2015, Kaiser has required Smith to travel to its San Diego brick-and-mortar call center once every six months to meet with her supervisor. [*Id*. at ¶ 35.]

Plaintiff Erika Sierra is employed as a Customer Support Specialist and has worked for Kaiser since September 7, 2004. [*Id*. at ¶ 36.] Sierra is compensated at a base rate of $26.74 per hour, $.55 extra per hour for acting as a Qualified Interpreter of Spanish, and an additional $.35 per hour for longevity. She typically works 40 or more hours per week (and more than 8 hours per day). Sierra's typical schedule is Monday through Friday from 6:00 a.m. to 2:30 p.m. and she rotates every other weekend and holidays, at the San Diego, California brick-and-mortar call center. [*Id*.]

1    Opt-in plaintiff Christa Fox is employed by Kaiser as a Telemedicine Specialist and
2    began her employment with Kaiser in October 2007.  [Doc. No. 78-3, at p. 63.]  Her typical
3    schedule is two to three varying week days per week and alternating weekends from 3:00
4    p.m. to 11:30 p.m.  Christa has worked as a Telemedicine Specialist remotely from home
5    and at Kaiser's brick-and-mortar call center in San Diego, California.  She regularly works
6    8-hour shifts for 40 or more hours per week and has been paid overtime for weeks
7    exceeding 40 hours and shifts exceeding 8 hours.  [Doc. No. 78-3, at pp. 63-64.]

8    **II.   _Procedural History._**

9    On December 21, 2017, Smith filed a hybrid class and collective action complaint
10   in the District Court for the Northern District of California, asserting Kaiser had engaged
11   in willful violations of the Fair Labor Standards Act ("FLSA," or 29 U.S.C. § 201, *et seq*.);
12   California Labor Code §§ 221, 223, 226, 226.7, 510, 512, 1174, 1194, 1197, 1197.1, 1198,
13   2802; California Industrial Welfare Commission Wage Order No. 4; California Business
14   & Professions Code § 17200; and the Private Attorneys General Act ("PAGA"), California
15   Labor Code § 2698, *et seq*, with respect to its policies and practices for the payment of
16   Telemedicine Specialists and Advice Nurses. [Doc. No. 1, at p. 2.] On April 20, 2018, the
17   case was transferred to this Court, pursuant to the parties' stipulation, and on June 5, 2018,
18   the case was transferred to the undersigned for all purposes, pursuant to the parties'
19   consent. [Doc. Nos. 28, 43.] Shortly thereafter, the parties reached an agreement for
20   conditional certification of an FLSA collective action and dissemination of a Court-
21   authorized notice, which was adopted by the Court. [Doc. Nos. 44, 48.]  At that time, the
22   conditionally certified collective action members were identified as:

23   > All current and former hourly telemedicine specialists who work or have
24   > worked for Kaiser Foundation Hospitals, or KP on Call, LLC, any time since
25   > May 21, 2015.

26   [Doc. No. 44-1.] A Notice of Right to Join Lawsuit was then disseminated to the 286
27   conditionally certified collective action members.  [Doc. No. 67-3, Stoops Decl., ¶ 16.] By
28   / / /

4

the time the opt-in period closed, 64 Telemedicine Specialists had filed their consent to join this action. [*Id*.]

Starting in July 2018, the parties engaged in a voluntary exchange of discovery and two mediation sessions with wage and hour class action mediator David Rotman. Additionally, plaintiffs informed Kaiser of their intention to amend the Complaint to add claims on behalf of Kaiser's Customer Support Specialists. Kaiser agreed to provide data and discovery concerning the Customer Support Specialists so that their claims could be thoroughly and adequately analyzed prior to mediation. This data sharing and mediation process culminated in a settlement between the parties in February 2019. [*Id*. at ¶¶ 17-23.]

Several months later, on May 30, 2019, plaintiffs filed the FAC pursuant to the parties' Joint Motion. [Doc. Nos. 66, 70.] The FAC adds Sierra as a class representative. Prior to her addition as a class representative, Sierra signed and submitted a consent form to join in the FLSA collective action. [Doc. No. 70, at pp. 1, 7, 9.] In addition, the FAC adds two causes of action (Violation of California Labor Code § 226.7, 512 and IWC Wage Order 5-2001 – Failure to Provide Rest Breaks and Violation of California Labor Code §§ 201-203 – Waiting Time Penalties). [Doc. No. 67-1, at p. 8; Doc. No. 67-3, at p. 10; Doc. No. 70, at p. 7.] It also redefines and broadens the scope of the action to include Customer Support Specialists and Wellness Specialists in addition to the Telemedicine Specialists included in the original Complaint. [Doc. No.1; Doc. No. 67-3, at p. 10.]

The FAC defines a California-based class under Rule 23:

> All similarly situated current and former hourly Telemedicine Specialists, Customer Support Specialists and Wellness Specialists, who work or have worked for Defendant (in a brick and mortar location or remotely) ***in California*** at any time from ***December 21, 2013*** through judgment.

[*Id*. at ¶ 98 (emphasis added).]

The FAC also defines an FLSA collective that is not specifically limited to California:

> All similarly situated current and former hourly Telemedicine Specialists, Customer Support Specialists and Wellness Specialists, who work or have

worked for Defendant (in a brick and mortar location or remotely) at any time from ***December 21, 2014*** through judgment.

[Doc. No. 70, ¶ 84 (emphasis added).]

The original Complaint included allegations indicating it was possible there could be a "nationwide" collective of employees with FLSA claims, because it was alleged that defendant employed Telemedicine Specialists out of San Diego, California, and Atlanta Georgia, who served patients located in California, Georgia, and Hawaii.  [*See, e.g.*, Doc. No. 1, at pp. 7-8, 18.  *See also* Doc. No. 37-1, at pp. 10-11.]  However, the allegations in the FAC are narrower, because it was learned in discovery "that all of defendant's employees work and reside in California" and "were based out of defendant's San Diego, California location."  [Doc. No. 78-1, at p. 9 n.2.  *See also* Doc. No. 70, at pp. 3, 10.]  In addition, the Amended Agreement defines FLSA Collective Members more narrowly to only include current and former employees who worked for defendant in its San Diego, California location.  [Doc. No. 78-2, at p. 5.]

### III.   *Terms of the Amended Class and Collective Action Settlement.*

In support of their Renewed Motion, plaintiffs submitted a copy of the parties' Amended Class and Collective Action Settlement Agreement and Release of Claims (the "Amended Agreement").  [Doc. No. 78-1, at p. 9, referring to Exhibit A, at Doc. No. 78-2.] Although the Amended Agreement is unsigned, plaintiffs represent they will file an executed copy prior to a Preliminary Approval Hearing.  [Doc. 78-1, at p. 9 n.1.]

The Amended Agreement defines the "Rule 23 Class Members" as follows:

> All current and former employees who, between ***December 21, 2013*** and preliminary approval (the 'Class Period'), worked for Kaiser Foundation Hospitals at its San Diego, California location, with the job title of Customer Support Specialist, Wellness Specialist, or Telemedicine Specialist, in job codes 20005, 50278, and 20186.  The Class Members are ascertainable through Defendant's employment and payroll records.

[Doc. No. 78-2, ¶ 1.6 (emphasis added).]

6

18cv780-KSC

The Amended Agreement also includes the following separate definition for FLSA Collective Members:

> All current and former employees who, between **December 21, 2014** and preliminary approval (the 'Collective Period'), worked for Kaiser Foundation Hospitals at its San Diego, California location, with the job title of Customer Support Specialist, Wellness Specialist and Telemedicine Specialist, in job codes 20005, 50278, and 20186, and who have already submitted an opt-in consent form (a list of all such individuals is attached at Exhibit A ), as well as all individuals who submit an opt-in consent form during the settlement notice period. The potential FLSA Collective Members are ascertainable through Defendant's employment and payroll records.

[Doc. No. 78-2, at ¶ 1.7 (emphasis added).]

Plaintiff's Renewed Motion does not explain why the employment period for Rule 23 Class Members is different from the employment period for FLSA Collective Members. For the sake of clarity to Class/Collective Members, plaintiff should address this difference prior to final approval.

The Amended Agreement requires Kaiser to pay a Gross Settlement Amount of $1,475,000, in addition to any employer payroll taxes. The Gross Settlement Amount is non-reversionary. [*Id.* at ¶ 1.20.] The Amended Agreement allocates the Gross Settlement Amount as follows:

> A Class Counsel Payment "for (a) attorneys' fees of $442,500, which represents thirty percent (30%) of the Gross Settlement Amount and (b) litigation costs actually incurred in representing the Class, supported by adequate documentation." [*Id.* at ¶ 5.2.]

> $7,500 as an incentive award for the original named plaintiff Smith, $5,000 to opt-in plaintiff Fox, and $2,500 to named plaintiff Sierra [*Id.* at ¶ 5.3.];

> $40,000 to settlement of PAGA claims for civil penalties, of which $30,000 (75 percent), if approved, will be paid to the California Labor & Workforce Development Agency ("LWDA") and $10,000 (25 percent) will be allocated to the Net Settlement Fund for distribution [*Id.* at ¶ 5.4.];

Up to $15,000 in Administrative Costs, which will be used to pay Simpluris, Inc., the Settlement Administrator, for administrative costs [*Id.* at ¶¶ 1.38; 5.1];

According to the Renewed Motion, the Net Settlement Amount (*i.e.*, the Gross Settlement Amount of $1,475,000, less the allocations outlined above) is estimated to be $917,500, but this amount is not included in the Amended Agreement. [Doc. No. 78-1, at p. 26.] The Net Settlement Amount is to be distributed as Individual Settlement Payments to Rule 23 Settlement Class Members and as FLSA Settlement Payments to FLSA Collective Members. [Doc. Nos. 78-2, ¶ 1.25.] A total of $203,142.50 of the Net Settlement Amount is apportioned for payment of FLSA Settlement Payments to the FLSA Collective Members. [*Id.* at ¶¶ 1.25, 5.5, 5.5.1, 5.6.] After accounting for the $203,142.50 to be used for FLSA Settlement Payments, the remaining portion of the Net Settlement Amount will be apportioned as Individual Settlement Payments to the Rule 23 Settlement Class Members. [*Id.* at ¶¶ 1.20, 1.21, 5.6.]

The Renewed Motion represents that 437 is the approximate number of current and/or former Telemedicine Specialists, Customer Support Specialists, and Wellness Specialists who may qualify to participate in the action as Rule 23 Class Members and/or FLSA Collective Members. [Doc. No. 78-1, at pp. 9, 26, 32.] The approximate number of potential class members is based on payroll and other documents and data produced during discovery by defendant and then analyzed by defense counsel and an expert. [Doc. No. 78-3, at pp. 14-15.] "[U]sing a straight average" (*i.e.*, dividing the estimated Net Settlement Amount of $917,500 by 437 without accounting for any individual differences in claims), the payments to each member would be approximately $2,099.54. [Doc. No. 78-1, at p. 26.]

In exchange for their portion of the Net Settlement Amount, the Amended Agreement provides that the Settlement Class, which is defined as all Class Members and Collective Members who do not file a timely and valid Request for Exclusion, will be bound by the release:

18cv780-KSC

[A]ny and all claims, debts, liabilities, demands, obligations, guarantees, costs, expenses, attorney's fees, damages, action or causes of action, contingent or accrued for, which relate in any way to the allegations and claims asserted in the Complaint, failure to pay overtime compensation (Cal. Lab. Code §§ 510, 1194, 1198, 1199, and Wage Order 4-2001); failure to reimburse business expenses (Cal. Lab. Code § 2802); failure to pay minimum wages and regular wages for all hours worked (Cal. Lab. Code §§ 223, 1194, 1197.1 and Wage Order 4-2001); unlawful wage deductions (Cal. Lab. Code §§ 221 and 223); failure to provide compliant meal breaks (Cal. Lab. §§ 226.7 and 512 and Wage Order 4-2001); failure to provide compliant rest periods (Cal. Lab. § 226.7 and Wage Order 4-2001); failure to provide accurate itemized wage statements (Cal. Lab. § 226(a)); failure to pay all wages owed upon termination in violation of Cal. Lab. Code §§ 201-203; violations of the PAGA (Cal. Lab. § 2698, *et seq.*); Unfair Competition (Bus. & Prof. Code § 17200); claims for restitution and other equitable relief, liquidated damages, punitive damages, off the clock work, rounding/grace period, overtime, minimum wage, interest, wages, on call time, meal and rest period penalties, waiting time penalties, penalties of any nature whatsoever, any other benefit claimed on account of the allegations asserted in the operative Complaint ('Released Claims'). This release shall extend through the date of final approval.

[Doc. No. 78-2, ¶¶ 1.39; 6.1.]

The Amended Agreement also includes the following release that applies to FLSA Collective Members:

By operation of the entry of the Final Approval Order and Judgment, and except as to rights this Agreement creates, each member of the FLSA Collective releases Defendant and the Released Parties, from any and all claims, debts, liabilities, demands, obligations, guarantees, costs, expenses, attorney's fees, damages, action or causes of action, contingent or accrued for, which relate in any way to the allegations and claims asserted in the Complaint and arise under the FLSA (29 U.S.C. §§ 201, *et seq.*).

[Doc. No. 78-2, at ¶ 6.2.]

Additionally, the Amended Agreement provides that each Settlement Class Member waives all rights provided by California Civil Code section 1542. [Doc. No. 78-2, at ¶ 6.3.]

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IV.**   ***Preliminary Approval of a Settlement in a Hybrid Action Involving Class Claims Under Federal Rule 23 and Collective Claims Under the FLSA.***

      **A.**   ***Preliminary Approval of a Rule 23 Class for Settlement Purposes.***

Federal Rule of Civil Procedure 23(e) instructs that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. Pro. 23(e). "The primary concern . . . is the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982).

"Approval of a class action settlement requires a two-step process—a preliminary approval followed by a later final approval." *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 319 (C.D. Cal. 2016). The primary objectives of preliminary approval are to determine whether a notice of the proposed settlement should be sent to the class and whether the court should schedule a final fairness hearing. 4 Newberg on Class Actions § 13:10 (5th ed.) In this regard, Rule 23(e)(1)(B) provides as follows: "The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court ***will likely be able to***: (i) approve the proposal [as fair, reasonable, and adequate] under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed.R.Civ.P. 23(e)(1)(B)(i)&(ii) (emphasis added). "The ultimate decision to certify the class for purposes of settlement cannot be made until the hearing on final approval of the proposed settlement." Fed. R. Civ. P. 23 advisory committee's note (2018).

Here, the Amended Agreement envisions a Rule 23 class consisting of "[a]ll current and former employees who, between December 21, 2013 and preliminary approval (the 'Class Period'), worked for Kaiser Foundation Hospitals at its San Diego, California location, with the job title of Customer Support Specialist, Wellness Specialist and Telemedicine Specialist, in job codes 20005, 50278, and 20186. The Class Members are ascertainable through Defendant's employment and payroll records." [Doc. No. 78-2,

¶ 1.6.]  Accordingly, in their Renewed Motion for Preliminary Approval, plaintiffs seek a finding that certification of a Rule 23 class *is likely* for purposes of settlement and judgment.

### 1.   *Numerosity.*

The class must be so numerous that joinder of all members individually is "impracticable." Fed. R. Civ. P. 23(a)(1). "A proposed class of at least forty members presumptively satisfies the numerosity requirement." *Del Valle v. Glob. Exch. Vacation Club*, 320 F.R.D. 50, 55 (C.D. Cal. 2017).  In their Renewed Motion, plaintiffs represent there are approximately 437 class members.  [Doc. No. 78-1, at pp. 9, 34.]  According to counsel's Declaration, this estimate was determined based on payroll and other documents and data produced during discovery by defendant and then analyzed by defense counsel and experts.  [Doc. No. 78-3, at pp. 14-15, 19-21.]  Accordingly, for purposes of preliminary certification, plaintiffs made an adequate showing on the issues of numerosity.

### 2.   *Commonality.*

This requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  To establish commonality, it is not necessary for all questions of fact and law to be common to the proposed class.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011).  However, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982)). This means that each member's claims must depend upon a common contention capable of class wide resolution, "which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 350.  Commonality does not depend on the number of common questions at issue; a single significant question can be enough to meet the requirement. *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014).

Here, common questions include whether defendant had an official or unofficial policy or policies that resulted in underpayment of work performed by Class/Collective

Members and whether defendant issued wage statements that did not comply with California law.  Therefore, for purposes of preliminary approval, plaintiffs have made an adequate showing that the class claims in the FAC involve common questions of law and fact that are central to resolution of the case.

### 3. *Typicality.*

The typicality requirement is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  "The requirement is permissive, such that representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (internal quotations omitted). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose, or the relief sought. The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992.)  "A court should not certify a class if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."  *Just Film*, 847 F.3d at 1116.

Here, the named plaintiffs' claims and those of putative class members are based on allegations that defendant's policies violate California labor laws and the FLSA. Moreover, Smith, Sierra and the putative class members are alleged to have suffered the same injuries because of the same course of conduct – policies resulting in the non-payment of wages for time spent on required job functions at the beginning, middle, and end of their shifts and failure to provide accurate wage statements.  Therefore, for purposes of preliminary certification, plaintiffs have made an adequate showing of typicality.

### 4. *Adequacy.*

The adequacy requirement asks whether the representative "will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). "The proper resolution

of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000).

Declarations by plaintiffs' counsel and each of the plaintiffs were submitted with the Renewed Motion stating under penalty of perjury that there are no conflicts among any of these individuals or with the members of the Class/Collective. [Doc. No. 78-3, at pp. 26, 54, 59, 64.] The Declaration of plaintiffs' counsel also indicates he has extensive experience in litigating wage and hour class actions. [Doc. No. 78-3, at pp. 6-9.] As outlined more fully below, the Court's concerns about the structure of the settlement have largely been addressed in the Renewed Motion and the Amended Agreement. However, as explained herein, some concerns remain. At this stage, it is not necessary for the Court to make a final determination as to whether the named plaintiffs or counsel adequately represent the class. For purposes of preliminary approval, plaintiffs and counsel have made an adequate showing.

### 5. *Predominance and Superiority.*

Rule 23(b)(3) provides that a class action may be maintained if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

"Rule 23(b)(3)'s superiority test requires the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair. This analysis is related to the commonality test. Underlying both tests is a concern for judicial

1  economy." *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175–76 (9th Cir.

2  2010).  The Court is satisfied that the relatively limited potential recovery for the class

3  members as compared with the costs of litigating the claims supports a finding that the

4  superiority requirement is satisfied.

5  "The Rule 23(b)(3) predominance inquiry asks the court to make a global

6  determination of whether common questions prevail over individualized ones." *Torres v.*

7  *Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016).  To satisfy the predominance

8  requirement, there must be significant, common questions capable of being resolved "in a

9  single adjudication" that is "apt to drive the resolution of the litigation." *True Health*

10  *Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018).

11  In this case, significant, common questions that are likely to "drive" resolution of

12  the litigation include whether defendant had an official or unofficial policy or policies that

13  resulted in underpayment of work performed by Class/Collective Members and whether

14  defendant issued wage statements that did not comply with California law.  Therefore, for

15  purposes of preliminary approval, the Court is satisfied that significant, common questions

16  predominate over individualized inquiries.

17  **B.**   ***Preliminary or Conditional Approval of an FLSA Collective for Settlement***

18  ***Purposes.***

19  The FLSA governs the minimum wage paid to workers and sets the standard for

20  payment of overtime to workers.  29 U.S.C. §§ 206, 207.  To aid in enforcement of its

21  provisions, the FLSA permits aggrieved employees to file an action to recover unpaid

22  minimum wages, unpaid overtime compensation, and liquidated damages.   29 U.S.C.

23  § 216(b).  The FLSA also permits employees to file any such action collectively.  In this

24  regard, Section 216(b) states in part as follows:   "An action to recover the liability

25  prescribed [in Sections 206 and 207] may be maintained against any employer . . . by any

26  one or more employees for and in behalf of himself or themselves and other employees

27  ***similarly situated***. No employee shall be a party plaintiff to any such action unless he gives

28  / / /

his consent in writing to become such a party and such consent is filed in the court in which such action is brought."  29 U.S.C. 216(b) (emphasis added).

"Party plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1117 (9th Cir. 2018).  For example, the "similarly situated" requirement is met where the plaintiffs challenge a policy or practice of not paying employees for overtime.  *Id.* at 1116.

A collective action can be appropriate even if the members of the collective are subjected to the challenged policy or practice "at different times, at different places, in different ways, or to different degrees."  *Id.*  A collective action can only be decertified "where conditions make the collective mechanism truly infeasible."  *Id.* at 1117.  "[I]n the collective action context, what matters is not just any similarity between party plaintiffs, but a legal or factual similarity material to the resolution of the party plaintiffs' claims, in the sense of having the potential to advance these claims, collectively, to some resolution." *Id.* at 1115-1116. Individualized damages calculations and the application of individualized defenses also do not preclude collective action.  *Id.* at 1116-1117.  "District courts are well-equipped to deal with issues of individualized calculations in the wage-and-hour context, and [they] may use 'any of the practices developed to deal with Rule 23 classes facing similar issues.'"  *Senne v. Kansas City Royals Baseball Corp*., 934 F.3d 918, 950 (9th Cir. 2019).

District Courts have "arrived at a loose consensus as to the proper procedure for determining whether the collective mechanism is appropriate."  *Campbell*, 903 F.3d at 1108-1109.  First, prior to discovery, the plaintiff typically moves for preliminary certification based mostly on "plausible" allegations in the pleadings indicating a collective action under the FLSA is appropriate, so that notices can be sent to putative members of the collective advising them they must affirmatively opt in to participate in the litigation. *Id.* at 1109.  Second, after relevant discovery has been exchanged, the Court can then "take a more exacting look at the plaintiff's allegations and the record."  *Id.* at 1109-1110.

Here, prior to discovery, the parties submitted a Joint Stipulation to Conditional Certification of FLSA Collective Action and Proposed Notice. [Doc. No. 44.] In the Stipulation, which was submitted to the Court before the FAC was filed, defendant agreed to provide a third-party administrator with contact information "for all Telemedicine Specialists employed by defendant at any time during the period between May 21, 2015 to the present." [Doc. No. 44, at p. 3.] The Court approved the Stipulation and Proposed Notice. [Doc. No. 48, at pp. 1-2.] Thereafter, based on allegations in the original Complaint, notice was sent to 286 Telemedicine Specialists, and plaintiff represents that 63 of these individuals filed consents to join the action. [Doc. No. 78-1, at p. 12; Doc. No. 1, at pp. 3-4, *et seq.*; Doc. Nos. 50-58, 60-62.]

After some discovery, the FAC was filed on May 30, 2019, and it included claims on behalf of employees in three categories: (1) Telemedicine Specialists; (2) Customer Support Specialists; and (3) Wellness Specialists. [Doc. No. 70, at pp. 2 *et seq.*] The same claims and causes of action are asserted on behalf of all three categories of employees. [Doc. No. 70, at p. 16 *et seq.*] According to the allegations in the FAC, the employees in all three job categories provide call center services by receiving and responding to calls from patients. [Doc. No. 70, at p. 2.] These employees allege they were injured by the same policies and course of conduct in violation of the same provisions of the FLSA and California labor law. [Doc. No. 70, at pp. 8 *et seq.*] Defendant does not challenge the plaintiffs' contention they are "similarly situated" and can pursue a collective action under the FLSA. Based on the information before the Court, the employees in the job categories of Telemedicine Specialists, Customer Support Specialists, and Wellness Specialists are "similarly situated" as that term is used in the FLSA.

## V. *Preliminary Approval of a Settlement Under Rule 23 and the FLSA.*

### A. *Standards for Evaluating a Class Action Settlement for Preliminary Approval Prior to Formal Class Certification*.

As noted above, preliminary approval requires the Court to consider the parties' submissions to determine whether a proposed settlement is likely to be approved as "fair,

18cv780-KSC

reasonable, and adequate." Fed.R.Civ.P 23(e)(1)&(2). In 2018, Rule 23(e) was amended to include a list of factors for consideration in determining whether a settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2). In this regard, Rule 23(e)(2) provides that a settlement can be approved as "fair, reasonable, and adequate" after considering whether: "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) [any statement by the parties identifying any agreement made in connection with the proposal]; and (D) the proposal treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2). However, the Advisory Committee Notes for the 2018 amendments also indicate this list of factors is meant to focus the analysis on "core concerns" but is not intended to "displace" any factors developed over the years in the circuit courts. Fed.R.Civ.P. 23(e) advisory committee notes (2018). *See also Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 n.10 (9th Cir. 2020).

The Ninth Circuit has identified the following factors as important to a determination of whether a settlement is "fair, reasonable, and adequate:" "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015).

The Ninth Circuit also requires District Courts to employ "extra caution and more rigorous scrutiny" when reviewing "settlements negotiated prior to class certification." *Roes 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019). In this regard, the

Ninth Circuit has stated that a thorough analysis is required, and that fairness cannot be presumed based on conclusory representations that, for example, "the settlement is the product of serious, non-collusive, arm's length negotiations and was reached after mediation with an experienced mediator." *Id.* at 1050 n.13. Rather, it is important to consider that "[t]he incentives for the negotiators to pursue their own self-interest and that of certain class members are implicit in the circumstances and can influence the result of the negotiations without any explicit expression or secret cabals." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003).

On the other hand, it is important to consider that "the settlement need only be potentially fair, as the Court will make a final determination of its adequacy at the hearing on Final Approval, after such time as any party has had a chance to object and/or opt out." *Acosta v. Trans Union*, LLC, 243 F.R.D. 377, 386 (C.D. Cal. 2007).

### B.    *Standards for Evaluating an FLSA Settlement.*

For the protection of workers who are typically in a weaker bargaining position than their employees, Federal Courts have generally concluded that FLSA claims for unpaid minimum and overtime wages cannot be waived. *Bodle v. TXL Mortgage Corp.*, 788 F.3d 159, 164 (5th Cir. 2015), *citing Brooklyn Sav. Bank*, 324 U.S. at 706–708 (1945). In this regard, "many courts have held that, in the absence of supervision by the Department of Labor or scrutiny from a court, a settlement of an FLSA claim is prohibited." *Id. citing Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350 (11th Cir. 1982). The Eleventh Circuit in *Lynn's Food Stores* concluded that a proposed settlement in an FLSA action must be scrutinized by the District Court to determine whether it constitutes "a fair and reasonable resolution of a bona fide dispute over FLSA provisions." *Id.* at 1355.

District Courts in the Ninth Circuit generally apply the "bona fide dispute" standard set forth by the Eleventh Circuit in *Lynn's Food Stores* when considering whether to approve a settlement in an FLSA action. *See, e.g.*, *Kerzich v. Cty. of Tuolumne*, 335 F. Supp. 3d 1179, 1184 (E.D. Cal. 2018); *Selk v. Pioneers Memorial Healthcare Dist.*, 159 F.Supp.3d 1164, 1172 (S.D. Cal. 2016); *Nen Thio v. Genji*, LLC,

14 F.Supp.3d 1324, 1333 (N.D. Cal. 2014).  Under the "bona fide dispute" standard, "[a] court will not approve a settlement of an action in which there is certainty that the FLSA entitles plaintiffs to the compensation they seek, because it would shield employers from the full cost of complying with the statute." *Kerzich v. Cty. of Tuolumne*, 335 F. Supp. 3d 1179, 1184 (E.D. Cal. 2018).  *See also Selk v. Pioneers*, 159 F. Supp. 3d at 1172. Alternatively, "[s]ome courts adopt the factors for approving a Rule 23 class action settlement even though some factors will not apply due to differences between FLSA actions and Rule 23 class actions." *Acuna v. So. Nev. T.B.A. Supply Co.*, 324 F.R.D. 367, 379 (D. Nev. 2018)

**C.**     ***Whether the Proposed Settlement Satisfies the Standards Applicable to Preliminary Approval***.

**1.**     ***The Structure of the Settlement.***

"Rule 23 actions are fundamentally different from collective actions under the FLSA." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013).  "FLSA and Rule 23 provide different means for participating in a class action: FLSA provides for participation on an opt-in basis (*see* § 216(b)), while Rule 23 requires that nonparticipating class members affirmatively opt out of the suit (*see* FRCP 23(c)(1)(B)).  In other words, the FLSA suit provides a means of participation for individuals who truly wish to join the suit, while requiring no action from those who do not wish to join.  By contrast, a Rule 23 class requires that a potential class member take affirmative action not to be bound by the judgment." *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 469-47070 (N.D. Cal. 2004).

"In a class action, once the district court certifies a class under Rule 23, all class members are bound by the judgment unless they opt out of the suit. By contrast, in a collective action each plaintiff must opt into the suit by "giv[ing] his consent in writing." 29 U.S.C. § 216(b).  As a result, unlike a class action, only those plaintiffs who expressly join the collective action are bound by its results." *McElmurry v. U.S. Bank Nat. Ass'n*, 495 F.3d 1136, 1139 (9th Cir. 2007).

For these reasons, the settlement of a Rule 23 class action suit that raises wage and hour claims under state law, along with claims under the FLSA, will violate the FLSA if it involves a release purporting to take away the FLSA rights of individuals who did not affirmatively elect to join the action.  *See, e.g., Kakani v. Oracle Corp.*, No. C 06-06493 WHA, 2007 WL 1793774, at 7 (N.D. Cal. June 19, 2007) (stating that counsel cannot "collude to take away FLSA rights including the worker's right to control his or her own claim without the burden of having to opt out of someone else's lawsuit. Workers who voluntarily send in a claim form and affirmatively join in the action, of course, can be bound to a full release of all federal and state rights. But [it] is unconscionable to try to take away the FLSA rights of all workers, whether or not they choose to join in affirmatively.").  Likewise, "[a] proposed settlement calling for a release of the FLSA claim in exchange for no consideration does not appear to be a fair and reasonable resolution of a bona fide dispute over FLSA provisions." *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 968 (N.D. Cal. 2019) (internal quotations omitted).

Previously, some structural problems with the parties' settlement agreement resulted in the denial of preliminary approval for reasons of fairness.  As outlined in the Court's Order Denying the Motion for Preliminary Approval, the structure of the prior proposed settlement required a release of FLSA claims without proper notice or consent and for no consideration.  No specific value was assigned to FLSA claims.  In addition, the procedures for opting out as a Class Member and opting in as an FLSA Collective member were confusing and had the potential to result in penalties.  [Doc. No. 72, at p. 19.]

The Amended Agreement alters the structure of the proposed settlement to address these fairness concerns.  As noted above, the Amended Agreement places a specific value of $203,142.50 on FLSA claims and allocates this portion of the Net Settlement Amount exclusively for FLSA Settlement Payments, so that FLSA Collective Members will be separately compensated for their FLSA Release.  [Doc. No. 78-2, at p. 8 ¶¶ 1.22; 1.25.] The Renewed Motion and counsel's supporting Declaration state that expert economists were consulted, and a determination was made that "$203,142.50 equaled the proportionate

maximum FLSA damages attributable to the Gross Settlement Amount." [Doc. No. 78-1, at p. 22 n.5; Doc. No. 78-3, at p. 22.]  In sum, unlike the prior settlement agreement, the Amended Agreement provides for a total of $203,142.505 of the Net Settlement Amount to compensate FLSA Collective Members with an FLSA Settlement Amount in exchange for an FLSA Release.  [Doc. No. 78-2, at pp. 8 ¶ 1.25.]

The Amended Agreement also re-structures the procedure for FLSA Collective Members to opt in when they receive a Notice of Class/Collective Action Settlement. In the prior agreement, Rule 23 Class Members could submit requests for exclusion indicating they did not "wish to participate in the settlement of this action."  [Doc. No. 67-2, at p. 13, 15 ¶ 4.1.1; 4.3.2.]  As to FLSA Collective Members, the prior agreement only allowed them to "opt in" when they received an Individual Settlement Payment check.  By signing and cashing the check, Rule 23 Class Members elected to also "opt in" as Collective Members and, at the same time, release their FLSA claims.  [Doc. No. 67-2, at p. 14 ¶ 4.2.] This procedure was inconsistent with Section 216(b) of the FLSA, which requires an employee to "consent in writing to become [a party plaintiff]" and also requires that any such consent be "filed in the court in which such action is brought." 29 U.S.C. § 216(b).

By contrast, the Amended Agreement provides for a "Notice of Class/Collective Action Settlement" to be sent to Class/Collective Members after preliminary approval of the settlement.  [Doc. No. 78-2, at pp. 8, 12, 13-14 ¶¶ 1.26; 3.1; 3.4.]  This Notice includes an explanation of "the procedures to submit an FLSA opt-in consent form. . . ."  [Doc. No. 78-2, at p. 12 ¶ 3.1.]  In addition, the Amended Agreement indicates that a consent form "must state, in effect, that the Collective Member wishes to participate in the FLSA settlement and be bound by the FLSA release."  [Doc. No. 78-2, at p. 14 ¶ 4.1.1.]

The Amended Agreement defines two different releases that apply separately to FLSA and non-FLSA claims:  (1) "'Released Claims' refers to all non-FLSA claims that will be extinguished by operation of this [Amended] Agreement and the events it provides for.  The Released Claims shall apply to all [Rule 23] Class Members who do not timely file a Request for Exclusion" [Doc. No. 78-2 ¶ 1.34]; and (2) "'FLSA Released Claims'

refers to all FLSA claims that will be extinguished by operation of this [Amended] Agreement and the events it provides for." [Doc. No. 78-2, at ¶ 1.35.]

The definition of "FLSA Released Claims" in the Amended Agreement also states as follows: "The FLSA Released Claims shall apply to all Collective Members who have already submitted an opt-in consent form . . . , as well as all individuals who submit an opt-in consent form during the settlement notice period, and ***who do not timely file a Request for Exclusion***." [Doc. No. 78-2, at p. 9 (emphasis added).] The phrase "and who do not timely file a Request for Exclusion" in the definition of "FLSA Released Claims" [Doc. No. 78-2, at p. 9 ¶ 1.35] seems to be misplaced, because a Request for Exclusion pertains to a "[Rule 23] Class Member" who "does not wish to participate in the settlement of this action" and does not wish to release their non-FLSA claims. [Doc. No. 78-2, at pp. 9, 14 ¶¶ 1.34; 4.1.1.] A Request for Exclusion does not pertain to FLSA Collective Members, who, by written consent, are opting in "to participate in the FLSA settlement and be bound by the FLSA release." [Doc. No. 78-2, at pp. 14-15 ¶ 4.1.1.] Since FLSA rights are determined on an opt-in consent basis, not on a Rule 23 opt-out basis, including the phrase "and who do not timely file a Request for Exclusion" in the definition of "FLSA Released Claims" is confusing and inclusion of this phrase has the potential to adversely affect the rights of Class/Collective Members.

Similarly, the Amended Agreement defines the term "Settlement Class" as "all Class Members and Collective Members who do not file a timely and valid Request for Exclusion." [Doc. No. 78-2, at p. 10.] Without more, it appears that "Settlement Class" should refer to "all Class Members who do not file a timely and valid Request for Exclusions and all Collective Members who have already submitted an op-in consent form, as well as individuals who submit an opt-in consent form during the settlement notice period." [*See* Doc. No. 78-2, at pp. 5, 12, 14-15 ¶¶ 1.7, 3.1, 4.1.1.] Conversely, it also seems that the definition of "Rule 23 Class Members" should include the phrase "and who do not timely file a Request for Exclusion."

/ / /

Next, Paragraphs 3.1, 4.2, and 4.4.1 of the Amended Agreement include references to the word "Settlement," but these references are somewhat ambiguous because "Settlement" is not a defined term. First, Paragraph 3.1 of the Amended Agreement states that "The Class/Collective Notice shall be substantially in the form attached as Exhibit B and include the amount of the Settlement. . . ." [Doc. No 78-2, at p. 12 ¶ 3.1.] This reference to "Settlement" seems to refer to the "Gross Settlement Amount." [*See* Doc. No. 78-2, at p. 7 ¶ 1.20.] The second and third references to "Settlement" in Paragraph 3.1 also pertain to the information to be included in the Class/Collective Notice: "the procedure to opt out of the Settlement through a Request for Exclusion, [and] the procedure to Object to the Settlement." [Doc. No 78-2, at p. 12 ¶ 3.1.] These references to Settlement apparently refer to the defined terms "Agreement" in this "Action." [*See* Doc. No. 78-2, at pp. 4-5 ¶¶ 1.1; 1.3.]

Next, Paragraph 4.2 of the Amended Agreement states that "Class/Collective Members shall be given the opportunity to opt out of the Settlement." [Doc. No. 78-2, at p. 15 ¶ 4.2.] In this sentence, "Settlement" appears to refer to the defined terms "Agreement" in this "Action," but it is not "Class/Collective Members" who may opt out. The Agreement only provides for "Class Members" (also referred to as "Rule 23 Class Members") to opt out; the Agreement does not indicate "Collective Members" can "opt out," as this would be inconsistent with the opt-in requirement in Section 216(a) of the FLSA. The final ambiguous reference to "Settlement" is in Paragraph 4.1.1 and states that "[r]equests for exclusion must state, in effect, that the Class Member does not wish to participate in the settlement of this action." [Doc. No. 78-2, at p. 14 ¶ 4.4.1.] In this instance, "settlement in this action" apparently refers to the defined terms "Agreement" in this "Action." [Doc. No. 78-2, at p. 14 ¶ 4.4.1.] Accordingly, for the sake of clarity, these matters should be addressed before preliminary approval.

Although the Amended Agreement does not use an endorsement of an Individual Settlement Payment check to opt in and release FLSA claims, paragraph 7.2, Final Approval still indicates plaintiffs' Motion for Final Order will seek the Court's approval

for "those who cashed a check" to join the action "for FLSA claims." [Doc. No. 78-2, at p. 26 ¶ 7.2.] This should also be corrected before preliminary approval.

Finally, as mentioned above, Section 216(b) states as follows: "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a ***party and such consent is filed in the court in which such action is brought***. 29 U.S.C. § 216(b). Therefore, the Amended Agreement and/or the Notice should indicate that opt in consent forms will be filed with the Court upon receipt.

In sum, the structure of the Amended Agreement resolves some of the fairness concerns raised by the parties' prior Settlement Agreement, which did not fully address the hybrid nature of the action and the difference between a Rule 23 class action and an FLSA collective action. However, some provisions of the Amended Agreement still need to be addressed before preliminary approval is appropriate. If the matters outlined above are addressed, the new structure reflected in the Amended Agreement appears to result in fair and equal treatment of Class Members and FLSA Collective Members. The Court is unable to discern any disadvantage to either of these groups that results from this new structure in the Amended Agreement.

### 4. ***The Settlement Amount and The Range of Recovery.***

To evaluate adequacy and fairness, "courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007). "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459.

The Amended Agreement states that the "Gross Settlement Amount" is $1,475,000. [Doc. No. 78-2, at p. 7.] The Amended Agreement defines "Net Settlement Amount" as "the portion of the Gross Settlement Amount that remains" after accounting for certain costs and expenses, including all "Individual Settlement Payments" and all "FLSA Settlement Payments." [Doc. No. 78-2, at p. 8.] The parties' Renewed Motion represents that: "The Amended Settlement identifies that the Net Settlement Amount

equals $917.500." [Doc. No. 78-1, at p. 10.]  However, the Court was unable to locate this specific amount in the Amended Agreement.  The Renewed Motion also represents that the Net Settlement Amount "*is estimated to be* $917,500, and this amount will increase with the addition of any un-awarded portions of the allocations," but this provision is also not included in the Amended Agreement.  [Doc. No. 78-1, at p. 26 (emphasis added).]  By contrast, the Amended Agreement does state that a sum certain has been allocated for FLSA Settlement Payments to the FLSA Collective Members.  In this regard, the Amended Agreement states as follows:  "A total of $203,142.50 of the Net Settlement Amount shall be apportioned for payment of the FLSA Settlement Payments to the FLSA Collective Members."  [Doc. No. 78-2, at p. 8.]

For reasons of fairness to all potential Rule 23 Class Members and FLSA Collective Members, the Amended Agreement should be modified to at least include an estimate of the Net Settlement Amount.  Ideally, for reasons of clarity and fairness, the Amended Agreement would indicate that the Net Settlement Amount is estimated to be "a minimum of $917,500," and it would also indicate that this amount could *increase* based on incurred expenses.  In addition, the Court notes that the definition of "Gross Settlement Amount" in Paragraph 1.20 should be updated in the Amended Agreement to list FLSA Settlement Payments to the FLSA Collective Members.

"A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable."  *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 332 (N.D. Cal. 2018).  Assuming the Net Settlement Amount is $917,500, approximately 58 percent of the Gross Settlement Amount will be distributed to Rule 23 Class Members and FLSA Collective Members.  Approximately 42 percent, *i.e.*, close to half of the Gross Settlement Amount, will be used to pay litigation and administrative expenses if the Net Settlement Amount is $917,500.  About 22 percent of the Net Settlement Amount is allocated to FLSA Settlement Payments.

As outlined above, potential Class/Collective Members were employed by defendant in three different job categories:  (1) Telemedicine Specialists; (2) Customer

Support Specialists; and (3) Wellness Specialists.  [Doc. No. 78-1, at pp. 9, 14-15.]  With the assistance of expert economists, plaintiffs reviewed documents and data produced by defendant to extract information about the potential Class/Collective Members in each of the three job categories, including their employment dates during the applicable statutes of limitation; rates of pay, employment dates; hours worked per week; and a percentage of shifts worked that equaled or exceeded 8 hours in a day and 40 hours in a week.  [Doc. No. 78-1, at pp. 14-16.]  For each job category, plaintiffs identified certain metrics that could be used to estimate defendant's exposure on each of the causes of action in the operative Complaint.  [Doc. No. 78-1, at pp. 13-20.]  The following are the metrics identified for each job category:  the total potential class members; the average hourly wage rate; the total number of work weeks; the total work weeks with hours equal to or greater than 40 hours; and the number of employees who separated their employment. [Doc. No. 78-1, at pp. 14-15.]

       According to the metrics provided in plaintiffs' Renewed Motion, the following are the total number of potential Class/Collective Members in each job category:  (1) 313 Telemedicine Specialists; (2) 92 Customer Support Specialists; and (3) 16 Wellness Specialists.  [Doc. No. 78-1, at p. 15.]  Based on these numbers, there are a total of 421 potential Class/Collective Members.  In their Renewed Motion, plaintiffs estimate there are a total of 437 potential Class/Collective Members.  [Do. No. 78-1, at pp. 9, 26, 32, 34, 36.]  The reason for the discrepancy in the number of potential Class/Collective Members is unclear and should be addressed prior to preliminary approval.

       The Amended Agreement provides that the Individual Settlement Payments and the FLSA Settlement Payments will be paid to Class/Collective Members on a *pro rata* basis using a formula that accounts for all Eligible Workweeks during the relevant time, as well as each individual's Eligible Workweeks, and the fact that Telemedicine Specialists were compensated, on average, 2.4 times the amount earned by other Settlement Class Members and FLSA Collective Members.  [Doc. No. 78-2, pp. 20-21 ¶¶ 5.5.1; 5.6.1.]  Defendant's time records will determine the number of Eligible

1   Workweeks used to calculate the payments.  [Doc. No. 78-2, at pp. 21-22 ¶¶ 5.5.1; 5.6.1.]

2   However, each Class/Collective Members will be given an opportunity to "dispute the

3   number of Eligible Workweeks."  [Doc. No. 78-2, at pp. 20-22 ¶ ¶ 5.5.1; 5.6.1.]

4        To provide some perspective, the Renewed Motion uses a straight average to

5   estimate potential payments to individual Class Members by dividing the Net Settlement

6   Amount of $917,500 by 437, the estimated number of potential Class Members.  In this

7   regard, the Renewed Motion states as follows:  "With an estimated 437 class members

8   (*i.e.*, assuming no [Class Members] opt out of the Settlement), the average payment to

9   them using a straight average is approximately $2,099.54 per employee.").  [Doc. No. 78-

10   1, at p. 26.]  In short, it appears that Class Members stand to receive a meaningful sum

11   for their participation in the Agreement.

12        On the other hand, there is no estimate of the number of potential Collective

13   Members.  Nor is there a straight average estimate of potential payments to Collective

14   Members, so the estimated value of FLSA claims to Collective Members is unclear.  It is

15   also unclear how the average Individual Settlement Payment and/or the average FLSA

16   Settlement Payment compare to the amount that could be recovered if the

17   Class/Collective Members were compensated for the full value of their viable claims.

18        The Renewed Motion also does not include enough information to discern the

19   overall fairness of the $203,142.50 allocated for the payment of FLSA Settlement

20   Payments relative to the overall Net Settlement Amount of $917,500 and/or the Gross

21   Settlement Amount of $1,475,000.  The only information on this point is in a footnote,

22   which states as follows:  "Class Counsel with the assistance of the expert economists

23   determined that $203,142.50 equaled the proportionate maximum FLSA damages

24   attributable to the Gross Settlement Amount."  [Doc. No. 78-1, at p. 22 n.5.]  There is no

25   information to support this statement, such as the number of potential Collective

26   Members and the other factors used to reach this amount.  There is some information

27   suggesting the amount allocated for FLSA Settlement Payments should be significantly

28   less than the amount allocated to Individual Settlement Payments.  For example, the

employment periods are not the same for Rule 23 Class Members and FLSA Collective Members.  The Amended Agreement states that the employment period for Rule 23 Class members begins on December 21, 2013.  [Doc. No. 78-2, at p. 5 ¶ 1.6.]  The employment period for FLSA Collective Members is shorter, as it does not begin until one year thereafter on December 21, 2014.  [Doc. No. 78-2, at p. 5 ¶ 1.7.]  Plaintiff's Renewed Motion also does not address why there is a difference in the employment periods.

The Renewed Motion does include an analysis of defendant's maximum potential liability for the different causes of action alleged in the FAC.  This analysis is based on discovery produced by defendant and witness statements.  First, as noted above, defendant's potential liability for "off-the-clock wage claims" (*i.e.*, failure to pay straight time and overtime wages plus liquidated damages) is in the range of $777,577 to $1,790,997.  It is unclear if this estimate pertains only to the California Labor Code claims or whether it also includes any potential liability for the FLSA overtime claims.  [Doc. No. 78-1, at p. 18.]

Second, the Renewed Motion represents defendant's maximum potential liability for failure to provide accurate itemized wage statements as required by the California Labor Code is $801,950 in penalties.  [Doc. No. 78-1, at p. 18.]  Third, for failure to pay the proper amount of wages and overtime at termination or resignation as required under the California Labor Code, defendant's potential liability is $769,074 in penalties.  [Doc. No. 78-1, at p. 19.]  Fourth, for failure to reimburse Class/Collective Members for necessary business expenses as required under the California Labor Code, defendant's potential liability is $100,000.  [Doc. No. 78-1, at p. 19.]  Fifth, defendant's potential liability for penalties under California's Private Attorney General Act ("PAGA") is $1,651,800.  [Doc. No. 78-1, at p. 19.]  Finally, plaintiffs determined they have no likelihood of success on their meal and rest break claims under the California Labor Code.  [Doc. No. 78-1, at p. 19.]

Based on this information, defendant's maximum potential liability for all viable causes of action appears to be $5,113,821, but this amount does not seem to include an

estimate of the maximum potential liability for the FLSA claims.  The Gross Settlement Amount of $1,475,000 is about 29 percent of defendant's maximum potential liability, and it does include an estimated Net Settlement Amount of $917,500.  From the Net Settlement Amount, $203,142.50 is allocated for the payment of all FLSA Claims, but it is unclear how this amount was calculated.  In sum, the Renewed Motion does not include enough information for the Court to assess the value of the settlement, and, without more, it is unclear whether the settlement treats Class/Collective Members equitably relative to each other.

> ## 5. *The Strength of Plaintiff's Case vs. the Risk, Expense, and Likely Duration of Further Litigation.*

"As a general matter, approval of a settlement is 'preferable to lengthy and expensive litigation with uncertain results.'"  *Millan v. Cascade Water Services, Inc.*, 310 F.R.D. 593, 611 (E.D. Cal. 2015), quoting *National Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  The strength of the plaintiffs' case favors settlement if "there are significant barriers plaintiffs must overcome in making their case."  *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010).

Defendant disputes the factual basis for many of plaintiff's allegations.  For example, plaintiffs' claims they were not paid for the time it took them to log in and out at the beginning and end of their shifts, but defendant asserts there is a written employment policy stating that employees are not supposed to clock in until their shift begins and are not permitted to work overtime without prior authorization.  [Doc. No. 78-1, at pp. 15-16.] Defendant also asserts these claims amount "at most" to seconds and has therefore asserted a "*de minimis*" defense which plaintiffs believe could possibly be a complete bar to their recovery on these claims.  [Doc. No. 78-1, at p. 29.]  In addition, defendant claims to have several witnesses who could refute plaintiffs' allegations with testimony indicating that Class/Collective Members are not instructed to complete the log-in process before the start of their shift but only to begin the process at the time of their scheduled shift.  [Doc. No. 78-1, at pp. 15-16.]  Defendant's assertions indicate the case is highly contested and that

the outcome of summary judgment motions and trial are uncertain and could be unfavorable to plaintiffs.  In short, the strength of plaintiff's case indicates that settlement is preferable to continued, expensive, and time-consuming litigation.

### 6.   *PAGA Payment.*

As explained by the California Supreme Court, PAGA provides that "an 'aggrieved employee' may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations. (Lab.Code, § 2699, subd. (a).)   Of the civil penalties recovered, 75 percent goes to the Labor and Workforce Development Agency, leaving the remaining 25 percent for the 'aggrieved employees.' (Id., § 2699, subd. (i).)"  *Arias v. Superior Court*, 46 Cal. 4th 969, 980–81, 209 P.3d 923, 930 (2009).

As noted above, the Amended Agreement allocates $40,000 of the Gross Settlement Amount to the settlement of PAGA claims for civil penalties, of which $30,000 (75 percent), if approved, will be paid to the LWDA and $10,000 (25 percent) will be allocated to the Net Settlement Fund for distribution.  [Doc. No. 78-2, at pp. 7-9, 19-20 §§ 1.20; 1.24; 1.29; 5.4; 5.4.1; 5.4.2.]

The Amended Agreement provides that "some approval of a PAGA Payment is a material term of the Settlement and this [Amended] Agreement."  [Doc. No. 78-2, at p. 20, § 5.4.1.]  If the Court does not approve a PAGA Payment, the entire settlement will in defendant's "sole discretion" be void and unenforceable.  [*Id.*]

Plaintiff's damages analysis, which was prepared with the assistance of two experts, estimated defendant's maximum potential exposure for PAGA penalties equals $1,651,800, if plaintiff were to prevail on all viable claims under the California Labor Code.  [Doc. No. 78-1, at p. 17-20.]  Although $40,000 to settle the PAGA claims seems low when compared to the maximum potential exposure, the Court cannot say the amount is unfair, inadequate, or unreasonable given the risks of continued litigation discussed above.  Accordingly, the Court finds that preliminary approval of the PAGA Payment is appropriate.

**7.** ***The Proposed Notice to the Class/Collective.***

In a hybrid action involving FLSA and state law wage and hour claims, notice to the class must inform potential Class/Collective Members about: "(1) the hybrid nature of th[e] action; (2) the claims involved in th[e] action; (3) the options that are available to California Class members in connection with the settlement, including how to participate or not participate in the Rule 23 class action and the FLSA collective action aspects of the settlement; and (4) the consequences of opting in to the FLSA collective action, opting out of the Rule 23 class action, or doing nothing." *Millan,* 310 F.R.D. at 608.

The proposed Notice does appear to include most of the required information. [Doc. No. 78-2, at pp. 36-51.] However, the Notice is confusing, and it does not clearly and understandably set out the consequences of opting in to the FLSA collective action, opting out of the Rule 23 class action, or doing nothing. In addition, the Notice includes typographical errors, and some of the terminology used in the Notice is not fully integrated with the terminology used in the Amended Agreement. A few examples of these problems are outlined below, but there are others, so a thorough review and revision of the Notice will be necessary before it merits preliminary approval.

To begin, several parts of the Notice, such as in paragraphs 7 and 8 on page 5 [Doc. No. 78-2, at p. 40], the term "Election Not to Participate form" (sometimes referred to in the Notice as election not to participate) should be changed to the term "Request for Exclusion." The Amended Agreement refers to this form as a Request for Exclusion, not an Election Not to Participate.

On the first page of the Notice in the capitalized section entitled "<u>PLEASE READ THIS NOTICE CAREFULLY</u>," the available options are not clearly explained, and the second paragraph uses the abbreviation "FLSA" without first explaining what the abbreviation means. In the second section entitled "WHAT IS THIS NOTICE ABOUT?," the first and second lines of the first paragraph have the word "settlement" in the wrong place. The word "settlement" should be placed after the word "hybrid" at the beginning of the first line. [Doc. No. 78-2, at p. 36.]

The definitions of the "Rule 23 Class Members" and the "FLSA Collective Members" are included in the proposed Notice on the first page and the third page, but these paragraphs should be enhanced to indicate that one paragraph describes "Rule 23 Class Members" and the other paragraph defines "FLSA Collective Members." In addition, these definitions should match the current definitions of these terms in the Amended Agreement.  [Doc No. 78-2, at p. 5.]

The section entitled "WHAT WILL I RECEIVE FROM THE SETTLEMENT?" on page 4 of the proposed Notice is also confusing, seems to be out of order, and uses terminology not included in the Amended Agreement.  First, paragraphs 4 and 5, which explain the "Net Settlement Amount" and how it will be distributed, should be inserted after paragraph 1, which explains the "Gross Settlement Amount."  [Doc. No. 78-2, at p. 39.]  The paragraph currently labeled "2" on page 4 should be re-numbered accordingly as "4" and should read as follows:  "Out of the Net Settlement Amount, Kaiser will pay to each Rule 23 Class Member who does not timely submit a Request for Exclusion an Individual Settlement Payment from the Net Settlement Amount (after reduction of the $203,142.50 attributed to FLSA Collective Members) that is calculated as follows:"  [Doc. No. 78-2, at p. 39.]

In the remainder of this section, the terms used should, for the sake of clarity, match those used in the Amended Agreement and in other places.  For example, there should be initial caps on the term "Individual Settlement Payment" in the paragraph currently numbered "2."  In this same paragraph, it appears the term "Class Member" should uniformly be referred to as "Settlement Class Member." [Doc. No. 78-2, at p. 39.]

The next paragraph of this section, which is currently labeled "3," should be re-numbered 5 and be re-written to avoid confusion and reflect the structure of the Amended Agreement.  For example, the first sentence in this paragraph should read as follows:  "Out of the Net Settlement Amount, Kaiser will pay to each FLSA Collective Member who previously submitted a valid FLSA opt in consent form or who submits a valid FLSA opt

/ / /

in consent form during the settlement notice period, an FLSA Settlement Payment from the $203,142.50 attributed to FLSA Collective Members, that is calculated as follows:"

Additionally, paragraph 13 of the Notice pertaining to Class Counsel Fees refers in the last sentence to the "Total Settlement Amount," and this should read the "Gross Settlement Amount" for the sake of clarity and consistency.

In sum, the proposed Notice needs to be thoroughly reviewed and revised before preliminary approval is appropriate.  Many revisions, including but not limited to the ones outlined above, will be necessary before the Notice is ready to be mailed to Class/Collective Members.

### 8.    *Litigation Fees and Costs*.

#### a.    *Attorney's Fees*.

"Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination whether the settlement is "fundamentally fair, adequate, and reasonable.  Fed.R.Civ.P. 23(e)."  *Staton*, 327 F.3d at 963.  "[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement."  *Id.*

In a case entitled *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011), the Ninth Circuit identified three "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."  *Id.* at 947.  First, collusion may be present where the agreement indicates counsel will receive a disproportionate distribution of the settlement.  *Id.*  Second, a "clear sailing" arrangement may signal collusion, because it suggests there may be "the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class."  *Id.*  Third, the potential for collusion may be present if the parties "arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *Id.*

Here, with respect to attorneys' fees, the Amended Agreement states as follows in Paragraph 5.2 entitled "Class Counsel Payment:"  "Class Counsel intend to request—***and***

***Defendant agrees not to oppose***—that the Court award a Class Counsel Payment, to be drawn from the Gross Settlement Amount, for (a) attorneys' fees of $442,500, which represents thirty percent (30%) of the Gross Settlement Amount and (b) litigation costs actually incurred in representing the interests of the Class, supported by adequate documentation. Class Counsel shall have no liability for any other attorneys' fees or costs. To the extent that the Court approves less than the amount of the Class Counsel Payment that Class Counsel request, the difference between the requested and awarded amounts will be distributed to Settlement Class Members on a proportional basis relative to the size of their claims as set forth in Section 5.5.1, below." [Doc. No. 78-2, at pp. 17-18.]  In addition, Paragraph 5.2.1 of the Amended Agreement states as follow:  "The Court's approval of the Class Counsel Payment in the amount requested is not a material term of this Agreement. If the Court approves only a lesser amount, then the other terms of this Agreement shall still remain in effect and the difference will remain part of the Net Settlement Amount." [Doc. No. 78-2, at p. 18.]

The Renewed Motion also represents that over 375 hours and more than $215,000 in attorney's fees have been incurred thus far. [Doc. No. 78-1, at p. 38.] Although it is not necessary to resolve the issue at this preliminary stage, the Court has some concern regarding counsel's request for 30 percent of the Gross Settlement Amount, because the "benchmark" for a reasonable fee award in the Ninth Circuit is 25 percent of the common fund.  *See In re Bluetooth*, 654 F.3d at 942.  "The amount of attorneys' fees is measured against the class's actual payout from the fund, rather than the full amount." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 258 (N.D. Cal. 2015).  The Court notes that the case is nearly resolved, and counsel has incurred fees that are less than half the requested amount of $442,500.  Plaintiffs' counsel should bear this in mind when a motion for fees is submitted.

The definition of Gross Settlement Amount in the Amended Agreement states that "no part of the Gross Settlement Amount will revert to Defendant."  [Doc. No. 78-2, at p. 7.]   In addition, it appears that all Class/Collective Members stand to receive a

1  meaningful sum if they participate in the settlement.  Thus far, there is no evidence of

2  collusion.  Finally, the Court will have the opportunity to look more closely at the amount

3  of requested attorney's fees at the time of final approval.  Accordingly, preliminary

4  approval of the Class Counsel Payment provision is appropriate.

5         *b.*     ***Litigation Costs.***

6        "An attorney who has created a common fund for the benefit of the class is entitled

7  to reimbursement of reasonable litigation costs from that fund."  *Carlin v. DairyAmerica,*

8  *Inc.*, 380 F. Supp. 3d 998, 1023 (E.D. Cal. 2019), citing *Harris v. Marhoefer*, 24 F.3d 16,

9  19 (9th Cir. 1994) (stating that "as part of the award of attorney's fees" counsel may recover

10  "those out-of-pocket expenses that would normally be charged to a fee-paying client").

11        The Amended Agreement further states that counsel intends to request "litigation

12  costs actually incurred in representing the interests of the Class, supported by adequate

13  documentation."  [Doc. No. 78-2, at pp. 17-18.]  In this regard, the Renewed Motion states

14  that counsel intends to seek approval of up to $55,000 in litigation costs.  [Doc. No. 78-1,

15  at p. 37.]  The Renewed Motion and counsel's supporting Declaration represent that

16  counsel has incurred "just over $47,000 in necessary and reasonable litigation costs" thus

17  far. [Doc. No. 78-1, at p. 39.]  Counsel believes these expenses "are reasonable, necessary,

18  and customary for FLSA and state wage and hour cases."  [Doc. No. 78-3, at pp. 29-30.]

19  In this regard, counsel's Declaration states that supporting documentation for these costs

20  is available for the Court's review when briefing is submitted for Final Approval of the

21  settlement.  [Doc. No. 78-3, at p. 29.]

22        Based on the information provided, the requested litigation costs appear to be

23  reasonable for purposes of preliminary approval.  Supporting documentation should be

24  submitted for the Court's review with any Final Approval briefing.

25         *c.*     ***Administrative Expenses.***

26        The Amended Agreement states that Simpluris, Inc. has been selected as the

27  Settlement Administrator.  [Doc. No. 78-2, at p. 10 ¶1.37.]  The Settlement Administrator

28  is charged with mailing the Notice and relevant tax and other forms to Class/Collective

Members; calculating Individual and FLSA Settlement Payments based on data provided by defendant and the formulas included in the Amended Agreement; remitting all tax payments; and mailing Individual and FLSA Settlement Payments to Class/Collective Members.  [Doc. No. 78-2, at p. 13 ¶¶ 3.2; 3.3.]  If any of the Notices are returned as undeliverable, the Settlement Administrator will attempt to determine the correct address using a "computer-based-trace search" so that the Notice can be re-mailed.  [Doc. No. 78-2, at pp. 13-14.]  In addition, the Settlement Administrator "will send a deficiency notice to the Class/Collective Members addressing any irregularities in the request for exclusion (such as failure to sign or include last four digits of Social Security Number)."  [Doc. No. 78-2, at p. 15 ¶ 4.1.2.]

The Amended Agreement allocates up to $15,000 to be drawn from the Gross Settlement Amount to cover distribution of the settlement proceeds.  [Doc. No. 78-2, at p. 17 ¶ 5.1.]  The Renewed Motion and the supporting Declaration of counsel represent that Simpluris, Inc. is "well-respected and has been utilized successfully" in other similar litigation.  [Doc. No. 78-1, at p. 40; Doc. No. 78-3, at p. 29 ¶ 61.]  Counsel's Declaration states that $15,000 "is reasonable given the number of individuals involved in the Settlement."  [Doc. No. 780-3, at p. 29 ¶ 61.]

Based on the information provided, the requested administrative fees are adequately supported and reasonable.  Preliminary approval of these costs is therefore appropriate.

### d. *Incentive or Service Awards.*

"Incentive awards for class representatives 'are fairly typical in class action cases' and appropriate in wage-and-hour actions where plaintiffs undertake a significant 'reputational risk.'"  *Millan*, 310 F.R.D. at 613, quoting *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958–959 (9th Cir.2009). "[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments." *Staton v. Boeing Co.*, 327 F.3d at 977.  "[E]xcessive payments to named class members can be an indication that the agreement was reached through fraud or collusion." *Id.* at 975.

36

Incentive or service awards are intended "to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d at 1057, quoting *Rodriguez v. West*, 563 F.3d 948, 958-959 (9th Cir. 2009). Therefore, incentive awards must be evaluated individually "using relevant factors," such as "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." *Roes*, 944 F.3d at 1043, quoting *Staton*, 327 F.3d at 977.

"[C]ourts [also] consider the proportionality between the incentive payment and the range of class members' settlement awards." *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 335 (N.D. Cal. 2014). "Incentive awards typically range from $2,000 to $10,000." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal. 2015). Courts in the Ninth Circuit have generally concluded that an incentive or service award of $5,000 is "presumptively reasonable." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015). *See also Carlin v. DairyAmerica, Inc.*, 380 F. Supp. 3d 998, 1024 (E.D. Cal. 2019); *Reyes v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 281 F. Supp. 3d 833, 862 (N.D. Cal. 2017); *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 906 (C.D. Cal. 2016); *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig., 295 F.R.D. 438, 470 (C.D. Cal. 2014)*. "Courts will, however, grant an award that exceeds $5,000 when warranted." *Dyer v. Wells Fargo*, 303 F.R.D. 326 at 335.

Here, plaintiffs seek $7,500 as an incentive award for named plaintiff Smith; $5,000 for opt-in plaintiff Fox, and $2,500 to named plaintiff Sierra. [Doc. Nos. 78-1, at p. 39.] 67-2, ¶ 5.3, 67-1, p. 19.] In support of these awards, counsel represents that plaintiffs Smith and Sierra and opt-in plaintiff Fox provided significant assistance to counsel in pursuing the case. For example, counsel's Declaration states that these plaintiffs assisted with the

investigation of the facts and evaluation of the claims.  They also provided counsel with documents; participated in multiple conferences with counsel; and were "invaluable" in developing the claims; conducting discovery; and reaching the settlement.  [Doc. No. 78-1, at pp. 39-40; Doc. 78-3, at pp. 28-29.]

In support of these incentive awards, the named plaintiffs and the opt-in plaintiff each submitted a Declaration outlining their involvement in the case and describing the time and effort they have spent assisting counsel by providing information, documents, and other evidence, and the risk they took by participating in the case.  These plaintiffs also state they understood their role was to represent and "even champion the other employees' interests," and they spent time talking to and answering questions from other potential class members about the mediation, settlement negotiations, and finalization of the settlement. In addition, these Declarations indicate the named plaintiffs have agreed to a release that is broader than the more limited releases for other Class/Collective Members.  They were willing to enter into this broader release, because it helped settle the case.  All three plaintiffs believe the settlement is fair and reasonable, and they do not believe the proposed incentive awards have compromised their duty to protect the interests of the Class/Collective Members.  [Doc. No. 78-3, at pp. 53-67.]

Based on the information presented, the incentive or service awards for the named plaintiffs appear to be reasonable under the circumstances.  As noted above, "using a straight average" (*i.e.*, dividing the estimated Net Settlement Amount of $917,500 by 437 without accounting for any individual differences in claims), the payments to each Class Member have been estimated to be approximately $2,099.54.  [Doc. No. 78-1, at p. 26.] Therefore, the requested service or incentive awards are more than the average payment. However, they are within the range of amounts awarded in other cases in the Ninth Circuit, and they are not disproportionate because they have agreed to a broader release and they have had significant involvement in the case.  Accordingly, the Court finds the proposed incentive or service awards for the named plaintiffs and the opt-in plaintiff are reasonable for purposes of preliminary approval.

### 9.    *The Proposed Method of Distributing Relief.*

Based on a review of the Amended Agreement, the following is a summary of the main features of the proposed method for distributing relief to the Class/Collective Members.

After preliminary approval, defendant will provide the Settlement Administrator with names, contact, and identifying information for each potential Class/Collective Member, and this information will remain confidential.  [Doc. No. 78-2, at p. 13, 32 ¶¶ 3.2, 3.3, 8.14.]    Thereafter, the Settlement Administrator will mail the Notices to the Class/Collective Members, along with Request for Exclusion forms, opt-in consent forms, and any required tax forms.  The Amended Agreement includes procedures to deal with returned mail so that reasonable attempts will be made to locate all Class/Collective Members.  [Doc. No. 78-2, at pp. 13-14 ¶¶ 3.3, 3.4.]  If there are any irregularities in timely-submitted Requests for Exclusion, the Settlement Administrator will send a deficiency notice explaining how to cure the deficiencies.  [Doc. No. 78-2, at p. 15 ¶ 4.1.2.]

The Notice to the Class/Collective Members will include an Employee Information Sheet.  Based on information obtained from defendant's time records, the Employee Information Sheet will show each Class/Collective Member how much they could expect to receive based on the pro rata formulas included in the Amended Agreement, which are based on an individual's number of Eligible Workweeks and other factors.  Individual Class/Collective Members will have an opportunity to dispute the number of Eligible Workweeks shown on the Employee Information Sheet, and the Settlement Administrator will then review any available documentation to determine whether an error was made in the calculation. [Doc. No. 78-2, at pp. 20-22, ¶¶ 5.5.1; 5.6.1.]  Checks for Individual Settlement and FLSA Settlement Payments will then be mailed to Class/Collective Members without the need to submit any further paperwork.  [Doc. No. 78-2, at p. 22 ¶ 5.6.2.]  If there are uncashed checks that amount to less than $5,000, the unclaimed proceeds will be sent to California Rural Legal Assistance, Inc.  If unclaimed proceeds are

/ / /

greater than $5,000, this amount will be proportionately allocated to Settlement Class Members.  [Doc. No. 78-2, at p. 22. ¶ 5.6.2.]

### *Conclusion*

For the reasons outlined above, IT IS HEREBY ORDERED that:  (1) plaintiffs' request for certification of a class under Rule 23 for purposes of settlement is GRANTED; (2) plaintiffs' request for conditional certification of an FLSA collective for settlement is GRANTED; (3) plaintiff's Renewed Motion for Preliminary Approval is DENIED without prejudice; and (4) within 45 days from the date this Order is entered, plaintiff must file an amended motion for preliminary approval, an amended settlement agreement, and an amended notice addressing the issues discussed herein.

IT IS SO ORDERED.

Dated:  August 26, 2020

Hon. Karen S. Crawford
United States Magistrate Judge

18cv780-KSC